IN RE H. A. GARDNER.—119 S. W. (2d) —.

Springfield Court of Appeals. September 12, 1938.

Rehearing denied August 10, 1938.

*Franklin E. Reagan, Paul M. Peterson* and *E. W. Jones* for informants.

*John S. Farrington* and *L. L. Collins* for respondent.

*H. A. Gardner, pro se.*

FULBRIGHT, J.—This case comes to the writer on reassignment, and is an original proceeding in this court seeking the disbarment of the respondent, H. A. Gardner. It was instituted by information filed May 16, 1936 by Boyle G. Clark, general chairman of the bar committees of Missouri, and the members of the advisory committee to the general chairman of bar committees of Missouri. June 15, 1936 respondent filed his answer in the nature of a denial to all charges contained in the information. Thereafter, Hon. Herman Pufahl, a member of the Polk county bar, was appointed and qualified as special commissioner to take the evidence herein and report his findings and recommendations to this court. Numerous motions subsequently filed having been disposed of, the evidence was taken and the commissioner made his report finding respondent guilty on counts 2, 3, 5, 6, 7 and 8 of the information, and not guilty as to counts 1 and 4, recommending a suspension of six months.

The information charged the accused with professional misconduct in the following specifications, to-wit;

"1. That during the year 1935 the accused did personally and through a paid agent and runner, namely M. M. Roberts, solicit and procure the claim and law suit of one Alyce Schutt, for damages and alleged personal injuries.

"2. That during the year 1935 the accused did through a paid agent and runner, namely M. M. Roberts, solicit and attempt to procure the claim and law suit of one Alta Sloan for damages for the alleged negligent killing of her husband.

"3. That in the year 1935 and subsequently the accused has employed and paid an agent and runner, namely M. M. Roberts, to solicit and procure claims and law suits for damages for alleged personal injuries and that the said M. M. Roberts under the direction and request of the accused has during said time solicited and procured law suits for the accused. That the said M. M. Roberts is not an attorney at law.

"4. That the accused interfered with the processes of the Probate Court of Greene County, Missouri, in the administration of the estate

of Alyce Schutt, a minor, in the prosecution of a suit in the Circuit Court of Greene County, Missouri, by Fred W. Carden, guardian and curator of Alyce Schutt, a minor, for the recovery of personal injuries; that the said accused interfered and hampered the prosecution of said suit by advising said Alyce Schutt to leave the jurisdiction of said Circuit Court of Greene County, Missouri, and by advising said minor to leave the State of Missouri, and that said minor did leave the State of Missouri.

''5. That said accused interfered with the processes of the Circuit Court of Greene County, Missouri, in the aforesaid case brought by Fred W. Carden, guardian and curator of Alyce Schutt, a minor for the recovery of personal injuries in the Circuit Court of Greene County, Missouri, by advising said minor, Alice Schutt to leave the the jurisdiction of said Circuit Court and by advising her to leave the State of Missouri, so that said cause instituted by said guardian and curator could not be tried and prosecuted.

''6. That Fred W. Carden, guardian and curator of Alyce Schutt, a minor, under appointment of the Probate Court of Greene County, Missouri, employed an attorney at law to prosecute a suit to recover damages for personal injuries to said Alyce Schutt, that the · appointment was approved by the consent of the Probate Court. That the accused interfered with the relationship between the attorneys thus employed by said guardian and curator and his client and the minor, Alyce Schutt and hindered and interfered with the performance of duties of said attorneys by advising said Alyce Schutt to leave the jurisdiction of said Circuit Court of Greene County, so that said cause could not be prosecuted and tried. That said Alyce Schutt was an important witness in said cause and necessary to the prosecution of said cause by her guardian and curator; that acting upon the advice of said accused the said minor left said state so that said suit could not be prosecuted.

''7. That in the year 1935, the practices of the accused, as an attorney at law was under investigation by the Bar Committee of the Twenty-third Judicial Circuit, that at the said time the accused appeared before the said committee and promised that he would refrain from unprofessional conduct and that in violation of that promise the accused committed said violations after the making of said promises aforesaid.

''8. That because of the above acts and transactions the accused has violated and abused his oath and duty as an attorney at law and brought his name as an attorney and his profession into disrepute thereby being guilty of misconduct and unprofessional practices.''

We have patiently and painstakingly delved into the voluminous record in this case consisting of approximately 1400 typewritten pages in an effort to develop a brief statement of the facts as disclosed

by the evidence. The commissioner's report as contained in informants' abstract of the record consists of 182 printed pages and is therefore too long to set out in full. We adopt his finding on each count which is either set out in substances or in full following our statement of evidence on the respective counts.

### Count I

Under this count the respondent is charged with personally and through M. M. Roberts (who was alleged to have been a paid agent and runner for respondent), with soliciting and procuring the claim and law suit of one Alyce Schutt, for damages and alleged personal injuries.

S. N. Brookshire, uncle of Alyce Schutt, testified that the next morning after his niece was injured he wrote respondent a letter telling him to come to see him and that afternoon he saw Roberts and that Roberts produced a contract which he signed, Roberts having the printed form at his house where Brookshire signed it. M. M. Roberts testified substantially to the same facts as to signing the contract and that he sent or gave the contract to Gardner because Brookshire wanted him to. Miss Schutt testified that respondent did not solicit the case, as did Roberts, Brookshire and the respondent.

The commissioner found that there were peculiar circumstances connected with the obtaining and signing of this contract but that the evidence was insufficient to sustain the charge that the contract was solicited by respondent or Roberts.

### Count II.

In this count the respondent is charged with soliciting and attempting to procure through M. M. Roberts, a paid runner, the claim and law suit of Alta Sloan, for damages for the alleged negligent killing of her husband.

Mrs. Sallie Sloan testified that her son, George, died Saturday night as a result of an accident; that Roberts came to see about the case the next morning, and that Ray Daugherty came soon after the boy was killed.

Walter Sloan, a brother of George, testified that he knew M. M. Roberts, and saw him at their home on Monday; that he talked about the case and represented himself to be a state highway inspector, and told what a good lawyer Gardner was; that it would be all right for them to hire him; that Roberts wanted his brother in law and sister to go see George Sloan's widow in Arkansas; that he, his brother in law, Cook, Roberts and Daugherty went to see the widow; that on the trip Roberts showed clippings from newspapers about Gardner, and photostatic copies of checks that he had received in law suits; that on the road Daugherty said he was working for Gardner; that Daugherty and Roberts sent him and his brother in law across the fields to tell Mrs. Sloan that there was a lawyer down there working for Gard-

ner and he wanted to see about getting the case; that at the time there was a lawyer from Springfield at the house talking to the widow and Roberts and Daugherty told him to tell the widow not to sign any papers until she had talked to them; that as soon as the other lawyer left Daugherty and Roberts came to the house; that Roberts told her there was a lawyer out there, Ray Daugherty, who was working under Mr. Gardner, and that he was an awful good lawyer to give a case to; that he later saw papers which Roberts and Daugherty had that had been signed by the widow; that present in the house were Ed Walker and Dell Walker; that on the way back they stopped at Neosho for the night and Roberts paid their bill; that the next day they stopped in Monett where Gardner lived and Daugherty and Roberts left and said something about Mr. Gardner; that while in Monett, Gardner's home was pointed out to them; that Roberts hinted that Ray Daugherty would pay them $10.00 for making the trip, but he "never got none"; that he did not know Gardner; that Gardner came out to his house, he reckoned his mother sent for him; that he had heard that his brother in law, Hensley sent for him; that Roberts and Daugherty promised to bear the burial expenses if they could get the case, but never said that Gardner would bear the funeral expenses; that the brother was not buried for five or six weeks.

Dell Walker, brother of the widow, testified that Roberts and Daugherty came to see the widow and wanted the case; that they got her to show them a contract signed with another lawyer; that they got it and put it in their pocket, or did something with it; that the widow did sign a contract with them; that he heard Gardner's name mentioned and that Roberts said he could get more money out of the case than the other lawyers could; that Daugherty produced newspaper clippings and checks with reference to Gardner; that he later saw the contract at a filling station, and that Roberts had it; that he was present when it was signed. He further testified that he did not know Gardner, and that no one was present at his sister's home claiming to be Gardner; that the widow signed the contract with Roberts' pen; that he did not know that Gardner ever asked for the case; that the widow told Roberts and·Daugherty she had lawyers; that they then told her that Gardner was a good lawyer and very seldom lost a case; that they did not say that they had authority from Gardner to be down there but that Roberts said he was working for Gardner.

The contract was between Alta Sloan, administratrix of the estate of George T. Sloan, and guardian and curator of the minor children, as party of the first part; and H. A. Gardner and Ray H. Daugherty, parties of the second part. It provided for a 50% contingent fee for representing her in a suit against the Shell Petroleum Company.

Edward Walker testified that a few days after his brother in law's death Roberts and Daugherty came to see the widow; that he was

present but did not hear all the conversation; that he heard Roberts and Daugherty tell her that they were taking care of such cases; that they told her that Gustin and Runion were not able to handle such a case; that Gardner and Daugherty were the lawyers to handle the case; that they made a trip to Bentonville for the purpose of fixing up a contract; that Mrs. Sloan signed some papers and signed the contract; that he saw her sign the contract down at the garage at Siloam Springs; that Roberts told him that he had made some investigation for Gardner and that Gardner was the best lawyer in the state of Missouri, and told him that the more the party got out of it the more he got out of it; that he had investigated for a number of lawyers and found that Gardner could get bigger judgments than anyone else; that Roberts' fees would depend on the amount of the judgment and that was the reason he recommended Gardner; that he did not know Gardner had called upon some of the parties in Springfield and refused the case; that Roberts and Daugherty displayed newspaper clippings about verdicts Gardner had obtained; that Roberts did most of the talking; that he claimed to know the lawyers his sister in law had obtained and said they were jack leg lawyers; that the case was settled by the Arkansas lawyers.

M. M. Roberts testified that he made the trip to Arkansas with Daugherty to get a contract from the Sloan people, but he did not handle the contract; that he just went along for the trip; that he had newspaper clippings in regard to Gardner's cases; that he had a photostatic copy of one check for $15,000.00 payable to Gardner and his client; that he did not know whether he still had them at his house or not; that Gardner did not ask him to go to Arkansas; that Ray Daugherty and he conceived the idea of going; that the Sloan boys went to Daugherty's office and wanted him to go and he and Daugherty went down and took the two boys along; that they were discussing the method of getting the contract; that Mrs. Sloan and her husband had been separated; that one of the boys suggested getting the contract in Daugherty's and Gardner's name; that they came back by Monett and stopped by Mr. Gardner's office the next morning; that he and Daugherty went in; that he did not remember whether Daugherty mentioned that Gardner's name was in the contract, but that something was said about getting the Sloan case; that when Daugherty came in, he said, "I got the Sloan case;" that he did not remember all the conversation; that he knew they talked about putting Gardner's name in the contract, but that Gardner did not know that they did; that he had no authority or directions from Gardner to get the contract; that he thought Daugherty told the boys on the trip that he had authority from Gardner.

H. A. Gardner testified that the first he heard of the Sloan case was a call from Brookshire; that it was a collect call and that he paid

the charges; that he had no arrangements with Brookshire to pay telephone charges, but that he received dozens of reverse charges every month; that he went to Springfield the next day and went to the Sloan home and talked to the family; that he declined the law suit and later had a conversation with Daugherty and told him about it; that he later learned that Daugherty and Roberts had gone to Arkansas to see the widow; that something was said about him going but he refused to go; that he did not talk to Daugherty about going; that Daugherty at the time probably had some of his contracts in his office; that Daugherty and Roberts stopped at his office and told him about getting the Sloan contract; that they never told him his name was in it.

The commissioner found: "There is no direct evidence except the statements made by Roberts and Daugherty that Gardner had anything to do with the procuring of the contract in Arkansas, but the circumstances in connection with the procuring of that contract would lead one to believe that he knew about the matter and if he did not, that he did later know about Daugherty and Roberts having procured the contract. I find he did not himself sign the contract, but it is my opinion that Ray Daugherty and Roberts on the return from Arkansas went to the respondent's office in Monett, and informed him of the fact that they had procured the contract. It must have been determined by some one that the only person who had a cause of action was the widow of George Sloan and his minor children, and of course, it was the object of Roberts and Daugherty to go to Arkansas to see the widow and have her appointed guardian of the minor children for the purpose of bringing a suit. There is no question but what they went to Bentonville and did something there at the court house, and no doubt it was procuring her appointment as guardian and curator; the contract entered into is between her as widow and guardian of the minor children on the one part, and Gardner and Daugherty on the other part. If Gardner had nothing whatever to do about that contract, why is it that Daugherty and Roberts would stop at his office in Monett on their way back to Springfield, after they had procured the contract from Mrs. Sloan? Why would his name be signed to the contract, and why would his name appear as one of the attorneys for plaintiff? He swears positively that he knew nothing about these matters and that he had refused employment by the Sloans in Springfield before the Arkansas trip because there was not much to the case and that the widow was the only one who could sue.

"He admits having a conversation with Ray Daugherty about what happened at the Sloan house, and that something was said at the house about going to Arkansas, and that he told them that he would not go, yet immediately thereafter Daugherty and Roberts do go. Roberts states that he went with Daugherty merely for the trip, yet it

seems strange that on that trip he would have with him newspaper clippings in regard to cases which Mr. Gardner had tried and in which he had verdicts, and also have a photostatic copy of a $15,-000.00 check and talk to these people about Gardner being the best lawyer in the state and being able to recover larger verdicts than anyone else, and that the Arkansas lawyers were not big enough for that kind of a case.

"I find therefore that M. M. Roberts did solicit and attempt to procure the claim and law suit of Alta Sloan for H. A. Gardner, in connection with Ray Daugherty."

### Count III

This count charges the respondent with having employed M. M. Roberts, who is not an attorney at law, to solicit and procure claims and law suits for him for damages for alleged personal injuries. As to this count, the testimony took a wide range, perhaps wider than justified in strictly legal proceedings.

M. M. Roberts testified that he was not a member of the bar; that he had known Gardner for twelve or fourteen years, and had done work for him for perhaps four years; that the work had been limited to cases and law suits; that he did not know how many contracts he had obtained for Gardner but he thought something like three or four; that in his estimation Gardner had paid him from $1400.00 to $1500.00 in the last four years; that all the contracts which he procured for Gardner were typewritten contracts; that he did not remember where he got the form in each case; that he got some when he was down at Gardner's office; that in the Edwards case he thought he had a blank and he had some made; that at one time he got a bunch of Gardner's contracts when the girl was writing some off; that he usually kept a little separate account of expenses but never kept any books on it and threw away all of his records as soon as a case was settled; that he drew something like $100.00 in the Watts case and in the Schutt case; that Gardner never at any time requested him to solicit or procure law suits for him; that he told him at least a dozen times and probably more never to solicit cases for him; that at one time he maintained an office as a public investigator and sent out letters similar to Exhibit B; that he did some investigating for three or four other lawyers, but mostly for Mr. Gardner; that he never got any part of the proceeds of a law suit or a commission; that he and Gardner never had any dispute about his pay.

The evidence concerning the Sloan case is heretofore set out under Count 2.

The testimony shows that Fred Watts was one of the persons injured in the accident with Alyce Schutt. On the day of the accident he went out and saw the driver of the car and some of the witnesses,

whose names Brookshire had given him; that he first went to see the driver and then took the driver with him to see the Watts boy; that he talked to the parents and they told him they were going to get Gardner for an attorney; that he produced and filled out the contract, and Watts and his sister or mother signed it; that the contract was sent to Gardner at Monett for signature and a copy sent back; that Gardner did not go out to see Watts and did not see the family for quite a while after that; that he did not solicit the contract, it was not necessary. The contract is dated January 30, 1935, and is signed by Fred Watts and H. A. Gardner.

The Edwards case: Mrs. Kate Edwards testified that she was injured December 10, 1934, and was taken to the hospital that night; that the next morning her daughter and a man and woman came to the hospital; that the man came to the bed and said his name was Roberts, and gave her a paper and told her to sign it; that she did not see the paper any more until she got home and found out it was a contract; that the contract, together with a letter, were mailed to her from Monett by H. A. Gardner; that Roberts came to the hospital numerous times and that he was the one that came out when the case was settled and told her she would have to take what was offered or she might have to wait three years and get nothing; that when Roberts came to the hospital she had never heard of an attorney by the name of Gardner, and was not in a condition to talk; that later a lady came to talk to her and Roberts asked her not to talk and for the lady to let her alone; that when Roberts came to the house he said he was working for Mr. Gardner, going around collecting up things; that he saw in the paper where Mrs. Edwards was hurt and he thought it was Ray Edwards' mother and that he could help her out quite a bit; that a Mrs. Sharp lived next door and had been a good friend; that Roberts had told a lady who came to see her that Gardner was taking care of her case; that she did not tell the lady she had employed Mr. Gardner; that she did not know the paper she signed was a contract until she got home from the hospital; that she was not present when her case was settled; that Mr. Roberts said that he would take care of the hospital bills.

Nellie Edwards, a daughter, testified that Roberts came to the house the next morning after her mother was injured and talked to her sister in her presence about seeing the piece in the paper with reference to her mother's injury; that she and the lady next door went to the hospital with him; that he spoke to her mother about Gardner being an attorney; that she did not remember what was said at the hospital but that Roberts worried her mother; that he was at the house several times after that; that he did not mention the names of any other attorneys; that she was present when the case was settled but she could not say whether Gardner's name was on the check or not; that she

knew Mrs. Sharp quite well and that she was a good friend of her mother; that Mrs. Sharp talked about Gardner being a good lawyer on the way to the hospital, but had said nothing about her mother getting Gardner until Roberts came to the house; that Gardner was not present when the settlement was made.

Katherine Hendricks testified that she was the daughter of Kate Edwards and was living at home at the time of the accident; that Roberts came to the house the next morning and said that he had seen the paper and had come to get the case for Mr. Gardner; that he was working for Gardner; that he tried to get her to sign something and she would not; that he came to the house often but he always came next door first; that she was not living with her mother when the case was settled but was there the night the men brought the check; that her sister went and got the check.

M. M. Roberts testified that he was first called by Mrs. Sharp who asked how to get hold of Gardner then asked him to come over on Turner Street; that he went over there and Mrs. Sharp was there with the children; that he did not tell them that he had heard about the case or had come to get it for Gardner; that he went back to the house that afternoon to meet one of the girls to go to the hospital with him; that he talked to Mrs. Edwards at the hospital and she was in her right mind; that he did not think he got a contract signed that time; that he did not remember whether it was the first or second time he went to the hospital that he got the contract signed; that he did not remember whether he had the contract with him or went and got a copy made at the Conklin Letter Shop; that he sent the contract to Gardner after it was signed; that he did not tell Gardner that he would look after expenses in the case; that Mrs. Edwards was worried about her children and that he took some money out of his pocket and gave to the girl. The contract obtained was dated December 11, and the accident happened the night of December 10.

On cross-examination Roberts testified that he did not know Mrs. Sharp when he went out, but she told him she had been a former client of Gardner; that she explained about the case and said she wanted Gardner to handle it; that Mrs. Sharp did all the recommending; that later a woman from Mr. Lincoln's office came out and wanted Mrs. Edwards to sign a statement; that Mrs. Edwards asked him about it and he told her not to sign it; that he did not have any authority or suggestion from Mr. Gardner to give these people any money and did not know that he would be reimbursed.

As to his activities in the Dr. Pepper matter, Roberts testified that the people involved were friends of his; that they asked him about Gardner handling the matter for them; that he had recommended Gardner to plenty of people; that he told them he did not think Gardner would represent them; that the men who carried the liability in-

surance were the ones who wanted Gardner to represent them on an annual retainer.

A letter from Roberts to Gardner had the following p. s.: "What have you done about the Teller case?" Roberts testified that he had investigated this case and just wanted to know whether or not Gardner was going to handle it; that he thought Daugherty got that case; that he did not know whether Gardner, Daugherty, or Teller employed him.

In a letter from Gardner to Roberts he stated: "I am herewith returning the Tomlin and Hall contracts, and hope that you can take up our contracts and get these cases out of the way." Roberts testified that he did not know whether he sent those contracts to Gardner or not, or whether it was Fred Stewart; that Gardner returned the contracts to him because Fred Stewart had left town.

In another letter to Roberts, Gardner said: "I just learned of a good railroad case settled one day last week for a little over $18,000.00 that everybody overlooked. It is a case we just as well have handled as not." Roberts testified that Gardner had talked to him about a case in Kansas, but that he did not know what Gardner had reference to when he wrote the above.

A Mr. Martin testified that Roberts had solicited him to go to Monett to see Gardner to get him to take a case which Mr. Page was handling. Roberts testified that he had discussed the case with Martin who wanted him to take him to Gardner; that he did not urge him to employ Gardner; that Martin had had a contract with Gardner's firm prior to that; and that Gardner told Martin if he had a lawyer he would have nothing to do with his case.

In a letter from Roberts to Gardner, it is stated: "Will have statements completed on Colored cases in few days." He testified that he had reference to some cases he was investigating; that he did not recall getting a contract signed by negroes, but was present.

In another letter from Roberts to Gardner, it is stated: "I had to postpone trip to Yelville until tomorrow. I understand they were to have funeral today."

In a letter from Gardner to Roberts, with reference to this case, he states: "I think he has spilled everything he ever knew and there have probably been some affidavits taken from him about your solicitation of this case. So, I think we had better let this alone and see what develops. If they settle with him the chances are nothing will happen."

In another letter from Gardner to Roberts, he states: "I have a letter from the party down at Crane, advising me that Endsley is now in Reed Springs with his father, who is section foreman there for the company. I have never heard from these people in any way

and rather hesitate to contact them unless there is some opening for so doing."

The commissioner's finding under this count is as follows:

"Informants placed M. M. Roberts on the stand as a witness. The respondent takes the position that inasmuch as the informants called M. M. Roberts as a witness and placed him on the stand that they are bound by his testimony and cannot contradict or impeach it. The commissioner does not concur in this view. It is true that in ordinary cases a litigant placing a person on the stand vouches for him and is not permitted to contradict or impeach his testimony unless taken by surprise, but it appears to me from the rulings of the appellate courts that in this character of cases, the above rule does not apply in all its strictness.

"There is no direct testimony that Roberts solicited cases for pay; in fact the evidence is to the contrary. The testimony shows that during a period of about three years, Mr. Gardner paid to Mr. Roberts from $1400.00 to $1500.00. No book accounts were kept; no checks or receipts are produced, so that it is impossible to determine what this amount was paid for except as claimed by respondent that it was paid for services rendered by Roberts in investigating cases. The fact that no book account was kept is a suspicious circumstance. There is no statement of amounts paid in any particular case except the Schutt and Watts cases, and one other. It seems unreasonable to think that Roberts would have kept no account except as he says, on a memorandum book and then destroy that, and it seems strange that Mr. Gardner kept no leger account under Mr. Roberts' name. The conduct of Mr. Roberts would lead one to believe that he was soliciting cases for Mr. Gardner. He had in his possession blank contracts from Mr. Gardner's office. He had clippings of newspaper accounts in regard to cases which Mr. Gardner had tried and in which he had secured verdicts and judgments. He had a photostatic copy of a $15,000.00 check which had been paid in one case. He had these with him when he went to Arkansas, and he exhibited them to the prospective clients. His explanation as to how he received these is decidedly unsatisfactory. It seems unreasonable that he would go into Mr. Gardner's office and pick up these papers without Mr. Gardner's knowledge or consent.

"After he procured the signature of Mr. Brookshire to the Schutt contract, he went out to see Mr. Watts, who was injured in the same wreck. While he says he went out there to procure a statement, yet it was the next day after the wreck, and he procured a contract from Mr. Watts. If he was not soliciting cases for Mr. Gardner, why would he have a blank form contract with him and procure the contract from Mr. Watts before he had seen Mr. Gardner. What was his ob-

ject in having the newspaper clippings and the photostatic copy of the check.

"The procurement of the contract from Mrs. Edwards is another feature which would indicate that he was soliciting cases. It is true that in that case he says Mrs. Sharp was the one who arranged in regard to the matter, yet, nevertheless, he had a blank form of Mr. Gardner's contract or had one written out, and procured Mrs. Edwards' signature to it. If he was merely employed to investigate cases for Mr. Gardner, it doesn't seem that he would do all of this work, because that is out of the ordinary line of work in investigating cases. Therefore, although the positive testimony shows to the contrary, yet my conclusion is that Mr. Roberts did solicit and procure claims and law suits for Mr. Gardner."

## Counts IV, V and VI

These three counts relate to the conduct of respondent in the case of Alyce Schutt. In count 4 respondent is charged with interfering with the process of the Probate Court of Greene county in the administration of the minor's estate. In count 5 respondent is charged with interfering with the process of the Circuit Court of Greene county in said case, and in count 6 he is charged with interfering with the relationship between attorney and client. These three counts were considered together by the commissioner because of their close relationship.

Alyce Schutt, a minor, was injured in an automobile accident January 27, 1935. She was an orphan, living with her uncle, S. N. Brookshire, and reached her twentieth birthday March following. Fred Carden was her curator, having been appointed to wind up a small estate. The day after her injury a contract was entered into between her uncle and Gardner. Learning that Carden was her curator, Gardner went to Carden with reference to the case. Carden said to get him to approve the contract he had with the uncle. Gardner said to explain the circumstances to Carden and at Carden's suggestion to work in the case with him. The Probate Judge refused to approve Gardner's contract and Gardner said, was quite hostile.

Carden testified that thereafter Gardner returned to his office and suggested that they go in the case together, that there was a reasonable fee in it and that they could play along and let the case drag until the girl became of age, and then tell the Probate Judge to go to Hell; that he suggested that they could get her out of the state if necessary; that there would be a $5,000.00 fee in it, and that it cost him 25% to get the case and then he had to split with Brookshire. Respondent denied these statements.

At the time of the accident Carden was Miss Schutt's curator, but had not been appointed her guardian. Brookshire asked the Pro-

bate Court to appoint him guardian, but was refused and Carden was appointed, and soon thereafter filed suit. Brookshrie was not friendly with Carden because of his conduct in closing up Miss Schutt's estate. After Carden's appointment as curator, Gardner, Brookshire and Roberts began looking for some way to get Carden out of the case. They tried to locate the foster parents of the girl to oust Carden of his jurisdiction as curator, but failed. They discussed sending her to Arkansas to live with an uncle and have a guardian appointed there, but Gardner found that this could not legally be done. They discussed getting the girl out of the jurisdiction of the Missouri courts.

In August of 1935 Carden employed Collins & Pierce to prosecute the suit, and they took charge of the case. Trial was set for October 21, 1935, but was not tried because Alyce left the state a few days before. Carden next saw her the summer of 1936, and never discussed the case with her afterwards. In February, 1936, the court appointed a commission of doctors to examine her, but she could not be located. The case was dismissed by her personally March 20, 1936, and Gardner on that day took a new contract from her and refiled suit.

Knowing that the case had been set for trial in October, 1935, in September Gardner wrote to Roberts: "I notice the first jury week in Springfield will be about the 21st of October. Don't you think it would be a good idea to have them send Miss Schutt down to Fort Scott (Smith) and not let this outfit know where she is so they cannot get in touch with her, so as to get this case over for the term?"

Thereafter, Alyce was sent to her uncle's in Fort Smith, and on November 11th she wrote Gardner asking if she could return to Springfield and how long she could stay. Gardner replied advising her it would be all right, but that she should conceal herself and not let her presence in Springfield be known.

Brookshire testified that he advised with Gardner with reference to getting the girl away from Springfield or what to do with her to get her out of the jurisdiction of the court; that Gardner did not first suggest it; that after she returned to Springfield she was kept concealed and was later taken by Brookshire down in the hills; that he asked Gardner about taking her to Arkansas and Gardner said he did not see anything wrong with it.

When the case was last set for trial in February, 1936, Gardner prepared letters which were given to her and mailed to the Probate Judge and the defendant's attorneys, demanding that her case not be settled.

Through February and March there was correspondence between Gardner and Roberts and between Brookshire and Gardner with reference to preventing the trial or settlement of the case. Gardner

prepared the papers for a change of venue which he forwarded to Roberts in a letter dated February 7th. Gardner testified that he did not recall that he suggested to Roberts to get the girl out of the state, but Brookshire often talked to him about it; that the suggestion about having her sent away first came from Brookshire; that in his letter of October 21st he was merely calling their attention to the fact that the case was set and triable; that he did not pay Roberts any money for taking the girl away, or for making a trip to see her; that the only time he ever saw her was when he made a trip to Arkansas on other business and talked to attorneys down there about preventing her removal; that he did not know that Alyce had gone to Arkansas until after she left; that he did not think he told Brookshire that it would be a good thing if she left the State of Missouri.

Upon this evidence, the commissioner found as follows:

"I do not see that Mr. Gardner interfered with any process in the probate court. It is true Mr. Brookshire asked to be appointed guardian, and the Probate Judge refused to appoint him, but I do not see that Mr. Gardner had anything to do with that phase of the case. There was no interference when Mr. Carden filed the written request of Alyce Schutt that he be appointed guardian, neither was there any interference by Mr. Gardner when Mr. Carden filed his petition asking that he be permitted to employ the firm of Collins & Pierce as attorneys to represent him in the circuit court, and therefore, I find there was no interference with the processes of the probate court and that as to count 4, respondent should be found not guilty.

"As to counts 5 and 6, an entirely different situation appears. The respondent does not deny that he talked to Brookshire and to Roberts and that he did everything he could to prevent the case which Carden had brought from going to trial, and that he did everything he could to prevent a settlement from being made, and that he wrote letters. . . . These letters are conclusive evidence to my mind that Mr. Gardner did everything he could to prevent a settlement from being made, and the case from coming to trial. The most damaging testimony is the correspondence that appears in the letters from Mr. Gardner to Brookshire and Roberts, and to Carden, and letters from those parties to him, and no one can read those letters and come to any other conclusion than that Gardner did everything he could to prevent Carden from making a settlement and from getting a trial of the case.

"As to the question of removing the plaintiff to the state of Arkansas, the testimony does not conclusively show that the respondent actually took any part in removing Alyce Schutt to Arkansas, but he knew all about it; the letters show that he counseled and gave advice in regard to the matter; that he knew she was in Arkansas. Alyce Schutt wrote him a letter asking him whether it would be all right

for her to come back, so that there can be no question that he knew that she was to be taken, knew that she was down there, and advised that she be kept under cover when she came back to Missouri. He wanted her kept away from here until she became of age so that he could then enter into a valid contract with her to represent her and bring a suit in her own name, and was fully aware of all the facts and and circumstances in connection with her being kept away so that no settlement could be made and the case not brought to trial. He knew that Collins & Pierce had been employed by Mr. Carden and that they were the attorneys in the case and that they were representing the guardian, yet at no time did the respondent ever talk to them about the matter or indicate to them his connection with the case or what was going on. Certainly and undoubtedly this was unethical conduct on the part of the respondent as to brother attorneys.

"I have therefore concluded that under all the evidence the finding on counts 5 and 6 must be that the respondent is guilty as alleged in the information.

"However, while I so find, I further find that there are extenuating circumstances in this connection. Here is a girl twenty years of age (several years ago, under our laws, she would have been competent to contract for herself); she is living with her uncle and aunt and has been for some time. She is seriously injured in an automobile accident. The doctors inform her uncle that some one must become liable for the doctor bills and the hospital bills, otherwise she will be taken to the county farm as soon as she is able to leave the hospital, and, thereupon Mr. Brookshire, her uncle, obligates himself for the doctor bills and hospital bills. Certainly he should have been entitled to some consideration in the matter and some consideration should have been accorded to him and to Alyce Schutt herself.

"Mr. Carden, who had been curator in order to sell the interest which Alyce Schutt had in the Christian county land, had done nothing whatever from the time of the closing of that sale, and when Mr. Brookshire went to him and told him about Alyce being injured, he informed Mr. Brookshire that the money was all gone and there was nothing in the estate, and he would have nothing further to do with it. Carden does not deny this statement, but evidently when he found out there might be some money coming into the estate, then he goes to the hospital, procures the request of Alyce Schutt that he be appointed guardian, and files it in the probate court and the appointment is made. Apparently from his testimony and that of Mr. Gardner he was perfectly willing that Gardner be employed. That Brookshire and Alyce Schutt wanted Gardner to handle this case is beyond dispute. Never at any time did they want anyone else to handle it. They were unfriendly to Carden on account of his handling her estate as curator. From the testimony there can be no

doubt that if Brookshire had not taken the attitude he did and with the advice and assistance of Mr. Gardner kept this case from being settled and from being tried, a settlement would have been made for the sum of $2,500.00, yet after Carden's suit was dismissed and Alyce Schutt was able to file her own suit, a settlement is procured by Gardner under and by the terms of which $7,500.00 is paid to Alyce Schutt and $500.00 is paid to Collins & Pierce, who brought the suit for Mr. Carden, and that without a trial of the case in the circuit court. After the settlement was made, Gardner took $2,500.00 of the $7,500.00, and turned over or there was paid to Alyce Schutt, the sum of $5000.00, although under the contract which Mr. Gardner had, he would have been entitled to $3,750.00 instead of $2,500.00.

"There is no justification for Gardner interfering with the process of the circuit court, yet in my opinion the above should be taken into consideration, and I call attention to these facts for that reason."

## Counts VII and VIII

The commissioner found on these counts as follows:

"According to the testimony, it appears that in the year 1935, complaint had been made against the respondent, and he was under investigation by the Bar Committee of the 23rd Judicial Circuit, and that he was notified that he was being accused of unprofessional conduct. One of the complaints then was that Roberts was employed by him to solicit cases. He then denied the charges; his own testimony shows as does also the testimony of members of that committee, that he promised the committee that he would refrain from anything that might appear to be unprofessional conduct such as he was charged with.

"According to the testimony of Mr. Roberts, and of the respondent, it appears that Roberts finished the investigation of certain cases upon which he was then working and that for a period of perhaps six months, refrained from doing anything which would indicate that he was soliciting cases for respondent, but the charges now are that after that period of time, he again did solicit cases for respondent as I have heretofore found under the third count of the information, and inasmuch as I have found the respondent guilty under counts 3, 5 and 6, it would necessarily result that he is guilty of the charges set out in counts 7 and 8."

Respondent placed on the stand a number of character witnesses from various communities in Southwest Missouri, witnesses of the highest standing, consisting of lawyers, judges, publishers, county and city officials, and business men, who testified to respondent's good reputation.

Respondent contends that this proceeding has not been treated as an adversary one; that the rules of evidence were not properly

applied; that the witnesses of informants were treated as the court's witnesses and not witnesses of informants; that the commissioner over respondent's objections permitted a very wide latitude to informants in presenting their evidence; that they were permitted to lead, suggest, cross examine, contradict and impeach their own witnesses; that the commissioner approved this procedure, holding that the rules of evidence did not apply in all strictness; that the testimony was elicited by this improper method and that the ordinary rules of evidence were ignored; that informants placed upon the stand numerous witnesses whose testimony completely vindicated respondent and thereupon informants were permitted to contradict and impeach such witnesses by improper cross examination by leading them and inquiring of alleged statements made on other occasions.

We have thoroughly and laborously pored through this voluminous record and find, we think, that there are some grounds for respondent's complaint; that an unreasonably wide latitude was accorded both sides in the taking of evidence and that the record is encumbered with much incompetent and unnecessary evidence. Nevertheless, it appears that the commissioner was very fair to the respondent as well as to informants, and in arriving at his conclusion he sifted the grain from the chaff; made his findings upon what we think is legal and credible evidence, and was in no way influenced or prejudiced by any improper evidence that crept into the record or by the method of procedure that was followed.

It has been held by the supreme and appellate courts of this state, in effect, that a proceeding such as the one at bar is not an adversary one; that it is neither a civil action nor a criminal proceeding, that it is a proceeding *sui generis.* [In re Richards, 63 S. W. (2d) 672; In re Sparrow, 9 S. W. (2d) 701.] While this is true, it is our conclusion that under the rules of our supreme court, at least after the preliminary investigation has been made and an information filed, such cases do assume the aspects of an adversary proceeding, as it clearly appears from the record before us, vigorously prosecuted on the one hand and as vigorously defended on the other. To the end that orderly procedure may be observed in such proceedings, it is our further conclusion that the rules of evidence in civil cases should apply in so far as practicable after the information has been filed and that departure from such rules should be permitted only when it is necessary to obtain the truth.

Be that as it may, this court is the final arbiter of this case and in reviewing the evidence before us, we have considered only the legal and credible evidence and disregarded all improper evidence, as we think the commissioner did, and find sufficient legal evidence in the record to justify the commissioner in finding the respondent guilty.

Respondent calls our attention to the treatment by informants accorded witness M. M. Roberts, an investigator employed by respondent, and then complains that the bar committee employed a special investigator, Mr. Fickeissen, of St. Louis, at $8.00 a day with an unlimited expense account; that this investigator's expense account included "beer"; that he made "social calls" and resorted to any "tactics he might see fit to employ." In referring to an investigation of the Edwards case in which it appears Mr. Fickeissen called on Mrs. Edwards and her daughters at their home, respondent says: "He may have been a 'process server' as he claimed, but he also had other qualifications. When asked if he had any social relations at the Edwards home before he served the process, he answered that he was there about two hours in the afternon, was back that evening and then went back again the following day. It took him about two hours to 'interview' these women on his first visit. He furnished the car and bought the beer, and modestly admits that he drank only one bottle out of seven. All this went on his expense account."

We must admit that Fickeissen's action in that instance lends neither dignity nor respectability to this investigation, and such conduct is hereby condemned by this court. However, this in no way justifies the conduct of respondent.

Both informants and respondent protest the recommendation made by the commissioner as to discipline; informants insisting that respondent be disbarred, respondent contending that he should be acquitted on all counts. In this connection we again quote from the commissioner's report.

"Having found the respondent guilty of professional misconduct on some of the counts as charged in the information, the question now to be determined is what shall be the punishment. Informants insist very strenuously that respondent should be disbarred, setting out the fact in their brief that this is not the first offense in which he has been charged, but that in 1924, a proceeding was instituted in the supreme court of this state charging the respondent with soliciting cases, which is reported in In re Sizer and Gardner, 267 Mo. 922; (in that case the charges were dismissed) that he was also found guilty of unprofessional conduct by the circuit court of Jasper County, in 1932, and that he was called before the bar committee of the Greene county committee, and charged with soliciting cases, and of employing M. M. Roberts, to solicit cases for him, and that he promised members of that committee that in the future he would refrain from any unprofessional conduct in that respect, and that he had violated that promise.

"In view of the fact that the respondent has shown by a number of witnesses of the highest standing that his reputation for being honest, truthful, moral and law abiding, and for being gentlemanly

and courteous to his clients and other attorneys, and for giving his clients fair treatment, was good, I have come to the conclusion that under the circumstances disbarment would be too severe.''

It is the opinion of this court that the power to disbar an attorney ought to be exercised with the greatest caution and only in extreme cases. In a recent case, In re Conrad, 105 S. W. (2d) 1, l. c. 15, the court said: '' . . . the power which is inherent in the courts to disbar should be exercised in all instances with great care; that this power is not an arbitrary or despotic one; but that where an attorney's professional misconduct is shown, the court should not hesitate to disbar or to take other disciplinary action, be the attorney of whatsoever station in life or of whatsoever standing at the bar.''

The special commissioner heard the witnesses, observed their conduct on the stand, and was in better position to weigh their testimony than we are, yet we believe he was too lenient as to the disciplinary action recommended, although the nature and character of the evidence as reflected by the entire record is not such as would justify disbarment. The disciplinary action to be meted out in each case rests with the sound discretion of the court, and in reaching its decision it should consider all the facts and circumstances, keeping in mind at all time that disbarment should be resorted to only when no other action will suffice. It is our conclusion in the case before us that suspension of respondent's license for a period of one year is sufficient to meet the ends of justice, to command due respect for the court, and to maintain the integrity of the profession.

It is therefore the order and judgment of this court that the license of respondent, H. A. Gardner, to practice law in the State of Missouri shall be suspended for a period of one year from the effective date of the judgment herein and until payment has been made of the costs of this proceeding.

*Allen, P. J.,* and *Smith, J.,* concur.